Our first argued case is Bell Semiconductor v. NXP, et al., 2023-1260. Mr. Silver. Good morning, Your Honors. May it please the Court, Blair Silver on behalf of Appellant Bell Semiconductor. In this case, the Board's obviousness decision cannot stand because the Board failed to follow a clear Supreme Court precedent that requires defining a clear starting point when evaluating the prior art reference, CHIM, for single reference obviousness. Evaluate that reference as a whole, identify the differences, and then find a motivation to depart from CHIM. In addition, the Board also erred in its analysis of the parasitic capacitance reduction limitation that requires a reduction between two specifically described claim layers in the 340 patent by resting on an incomplete and, more importantly, an unargued inherency finding that NXP has now expressly disavowed in its briefing. Now, I'll focus my remarks today on Claim 1. If the Court has any questions about Claims 16 and 17 that are also in our brief, please feel free to ask. Now, on the first issue, the Board did not grapple with CHIM, the main and only reference against Claim 1 as a whole. Now, there's no dispute on the law in this case. References must be read as a whole, even the parts that teach away. References require a starting point to comply with GRAM, where you identify claim differences, and then you need a motivation to meet those claim differences. And as Westlaw teaches, you cannot pick and choose out-of-context parts from the specification. But that's exactly what the Board did here. NXP's changing starting point embodies this problem. When the Board was deciding this case before, it was CHIM alone that was abundantly clear in the briefing. By the time we get on appeal, and this is probably emblematic of CHIM's lack of teaching of integrated circuit package substrates, it's now an integrated circuit package substrate that's a typical integrated circuit package substrate being modified by CHIM. Moreover, the Board in this case had trouble even determining whether there was this parasitic capacitance reduction in CHIM because it could not find a starting point for which to evaluate that. But here, CHIM as a whole describes a printed circuit board with surface traces and pads, underlying reference planes with cutouts and compensation capacitors that fix a known impedance mismatch in CHIM. Starting with that point, the Board needed to find, identify the differences and find a motivation. And those differences on appeal are the integrated circuit package substrate and the parasitic capacitance reduction between the claim layers that we'll talk about in a minute. Mr. Silver, of course, what a reference teaches is question of fact. And so you've got a substantial evidence burden to overcome here. Well, Your Honor, traditionally, yes, that is the standard review for what a reference does teach. In this circumstance, though, the Board's analysis disembodied of the reference was flawed because they failed to actually identify the starting point to compare the reference to the claims. So yes, while the actual reference teachings is a question of fact, the legal question of what is the framework for obviousness and how you comply with GRAM is a legal question that the Court can look at de novo. Now, here, you need look no farther than NXP's response briefing to see how weak the disclosure on integrated circuit package substrate is, where they seem to admit tacitly that CHIM doesn't describe it because they modified their ground to now be a typical IC package substrate that is then modified by CHIM. They wouldn't need to do so if CHIM had a clear disclosure of integrated circuit package substrate. So you argue that there's a mismatch between CHIM and the asserted claim? There's an impedance mismatch in CHIM in terms of what it's the problem it's solving. There's a mismatch. But there's also the claims don't line up because CHIM doesn't disclose an integrated circuit package. Isn't that the case in all situations where you're looking at obviousness? Absolutely. I mean, if they did match up, then we'd have anticipation. And we do not have anticipation in this case. And this is a limitation where they were arguing obviousness. And so here, we know that something is missing, and the board needed to bridge that gap to find the integrated circuit package substrate. And here, the only thing the board latched onto, and that NXP mentions briefly on appeal, are individual words of the word substrate and semiconductor implementations plucked out of context from the brief. And as we explained in our briefing, each of those circumstances was indisputably talking about the printed circuit board side of a ball grid array. You're talking about the larger motherboard-looking device, not the small integrated circuit on top. And there's been no dispute about that in their briefing, that those mentions of semiconductors, those mentions of substrates, were all talking about the PCB side of a ball grid array. Now, the board dismissed the impedance-matching goal of CHIM as not germane to its inquiry. The board misread that case law. That case law is talking about whether the prior, for an obviousness, you need the exact same motivation. Here, we're talking about modifying CHIM away from its core purpose of impedance-matching. And there's no dispute that that is the core purpose of CHIM, is to match impedance between a surface microstrip and a pad. Now, the board and NXP have not given any reason why you would ignore that goal, in fact, contrary to that goal, in the proposed modification to CHIM. And there's no dispute in this case that if you were to add cutouts, underlying cutouts, in a system that doesn't have an impedance problem, you would actually cause an impedance problem. And there's no dispute in this case that CHIM criticizes using cutouts in reference planes alone. And the law is clear, and again, undisputed, that you cannot change the basic principles of operation of a reference in obviousness, and you cannot modify away from a key feature without a concrete reason why, a motivation. And here, the board identified none. Now, I'd like to turn, unless the court has any questions about that first module, to the inherency argument with regard to the 3-4-0 patent. This argument is independent of the single reference obviousness argument I just mentioned. The 3-4-0 patent requires that the cutouts reduce parasitic capacitance between two specifically claimed layers. There is no dispute in this case that CHIM does not say that. CHIM talks about reducing parasitic capacitance at the pad. You can see this in Figure 2a of CHIM. Element 220 is the pad. It's a square. It's a component in the middle of the surface. Layer 200 is the broader area in CHIM that includes the traces and the compensation capacitors and other elements that would be present on there. NXP has conceded abundantly clear in its briefing that it did not argue inherency in the disclosure. NXP has conceded the board didn't find inherency. That's because NXP never raised inherency. So at this point, the board cannot make an inherency finding. Indeed, the board's only support for the physics involved between the two claimed layers was from one paragraph in their expert's background statement. And it's abundantly clear in the law that an expert's single paragraph in a background statement is not preserving an argument for appeal. It certainly was never applied to CHIM in this case by any party. And therefore, what you have is a reference that does not teach something, no inherency, and no obviousness argument to go along with it. And so there's no basis, there's no substantial evidence to affirm the board's decision with regard to the inherent disclosure. And moreover, the only evidence of record is actually that the capacitance between the layers is not known, and in fact could be greater than before you do CHIM's method. And that's undisputed on appeal. Your Honor, I would like to briefly touch on Claims 16 and 17 because I think I have a minute. On Claims 16 and 17, Claim 2 requires a second electrically conductive layer that is a routing layer. The board found that this claim was not shown to be unpatentable. And it did so because NXP had failed to provide a motivation to change CHIM's undisputed second layer from a reference claim to a signal claim. Now, in their briefing before the board, NXP for Claim 16 pointed back to Claim 2 without analysis to say, see Claim 2. Once they tied those claims together, the board could not come to an inconsistent result because there's no separate argument to evaluate for that inconsistent result. In effect, Claim 2 became representative of Claim 16. Moreover, there was no dispute that CHIM doesn't disclose this second reference claim, so a second layer as a signal claim instead of a reference claim. Claim 16 requires the adjacent electrically conductive planes mentioned in Claim 12 to be signal planes. They require them under the serial data stream limitation in Claim 16. Because they're tied together and because there's no argument of that, Claim 16 is even farther away than Claim 2 was. And because there was no motivation in the record to convert the second layer to a signal layer, there's no basis for the board to have found that those claims were unpatented. Now, if the court has any further questions on any of those issues, I'd like to reserve the remainder of my time for rebuttal. We will hold it for you. Mr. Fenton. Good morning, Your Honors, and may it please the Court. My friend, Indeed, raised a number of arguments that were addressing factual determinations by the board, which were reviewed for substantial evidence. These arguments should be denied because the board did make factual determinations, citations of the evidence, and then explained their rationale. Bell is effectively asking this Court to reweigh the evidence, which it does not do on appeal. So let's take a look at the – I want to address the points that were raised here particularly. Let's look at the integrated circuit – sorry, integrated circuit package substrate. Okay. Bell argues that Chinn only discloses a printed circuit board or PCB implementation or embodiment. And, in fact, Chinn does describe an embodiment as a printed circuit board, uses those words very carefully. However, the board disagreed that this is the only teaching of Chinn. The board found that Chinn actually expressly discloses an IC package substrate. Appendix 20, citing to Chinn, 1.61.62. Specifically, Chinn describes a substrate using – a substrate used inside a BGA package. A BGA package is exactly the same type of IC package substrate that the 340 patent and the 269 patent are talking about. The board went further and found that Chinn expressly – So Chinn discloses the use of cutouts. So I'm getting – so Chinn – yes, Chinn discloses the use of cutouts and it discloses an IC package substrate. Does it matter what size those cutouts are? Does it matter what size they are? Right. It does matter. Does Chinn require them to be a certain size? Chinn does not require them to be any particular size. The board expressly found that Chinn, in its disclosure, suggests and teaches the use of its cutouts and its design in an IC package substrate. The board quotes, The present invention relates generally to the design and fabrication of printed circuits and multilayered substrates. Now, those are different – the multilayered substrate is a broader class of things than a printed circuit board. And we'll see in another example later that Chinn was very careful with his language. And again, Chinn also describes another example. It's talking about examples or applications of its technology in the background section. And it says, Another example is a substrate used inside a BGA package. That's a Chinn 56-65 cited by the board in Appendix 22. So there's substantial evidence, right? If there's a chance that there are two different interpretations of Chinn, that satisfies substantial evidence if they picked one and explained why. Okay. Bell also argues that the board ignored the other features of Chinn and its goal. The teachings of Chinn are not limited to the structure of its preferred embodiment. Netflix and Lear make that very clear. Further, the board actually addressed those additional features. So the features that my friend brought up were microstrips and tuning capacitors. Okay. First, the board found that Chinn does not require microstrips. This finding is based on substantial evidence, including Chinn. Specifically, Chinn talks about microstrips as one embodiment. But it also talks about interconnecting traces. Again, a broader term. Chinn's very clear when he wants to differentiate between something specific and something broad. So the board found that microstrips were not required. And Dr. Bauer, who is Bell's expert, admitted that in an IC package substrate, microstrips and other tuned impedance lines were not necessary because they're very small and the speeds were less than 4 gigahertz, the ones that Dr. Bauer was familiar with. And so microstrips in particular, that particular type of line, was not required. Now, my friend talks about microstrips. He's making a point on microstrips because he's saying, you know, Dr. Bauer says that they're not in an IC package substrate. But Chinn is not limiting his disclosure to that particular problem, microstrips on a PCB. He says that the problem, and again, that's in that background of the invention section, is the large pads versus the smaller interconnecting traces is the phrase that Chinn uses. That causes an impedance mismatch, which he's trying to address. Okay. And then Bell argues that the board erred by ignoring the purpose of Chinn. Again, the purpose was misstated. This argument was forfeited as well. And the stated purpose of Chinn does not limit that disclosure. Okay. Go back to what you were saying. What did you say is the purpose? Chinn disclosed the purpose of the microstrips. Is it to address impedance or to cause it? Does it cause the impedance? Chinn. Does it address it? So Chinn observed a problem where you have this impedance mismatch, where you have a large pad and a thin interconnecting trace. And so Chinn observed this and said, okay, let's solve this problem. Along the way, Chinn observes that, hey, in the prior art, people would cut out this metal beneath to reduce the parasitic capacitance. And then Chinn discloses this additional fine-tuning, that's the word that Bell uses in his brief, this fine-tuning to add just a little bit back in to really match the impedance of the line. But Chinn discloses both. The problem being solved that he's observed is an impedance mismatch between the large pad and a thin interconnecting trace. And then he's trying to solve that with this capacitance reduction. And then Chinn offers a fine-tuning option as well. Okay. My friend brought up the issue of capacitance, whether or not there was a disclosure of the reduction of capacitance. The board found, so first of all, the board properly construed the phrase cutouts for reducing parasitic capacitance between the pad layer and the second layer. My friend has used a couple of different, in the briefing in today, has used a couple of different types of capacitance. He talks about parasitic capacitance, that's in the claim. And then he talks about capacitance, overall capacitance. And the claims speak nothing about overall capacitance. It's just talking about parasitic capacitance between that pad and the layers below it. The board relied on substantial evidence to determine that Chinn's cutouts were disclosed to reduce parasitic capacitance and were successful. In particular, Appendix 36 to 37, it cites the Chinn's experiment where Chinn built a mock-up, I guess, of his design, ran it, and determined that it not only matched the impedance, but he also reduced the excess capacitance, another phrase for parasitic capacitance, and was able to achieve speeds of four to seven gigahertz, which is way, way faster than what the 340 pad is talking about. So there's substantial evidence that capacitance was reduced, parasitic capacitance. I'm sorry, I need to be precise. Parasitic capacitance was reduced in that example. Okay. My friend also talks about Claim 16 and 17 rising and falling. With Claim 2, the board correctly recognized NXP's, excuse me, NXP only cited to a portion of Claim 2, and the board correctly recognized that NXP was only referencing Claim 2 for its commensurate limitations in Claim 2. That's in Appendix 68. Is that because Claim 2 turns on routing placement limitation and Claim 16 and 17 don't have that limitation? That's the reason that Claim 2 was found not invalid, whereas 16 and 17 were, because that part of Claim 2 the board disagreed with the petition and did not find the routing layer limitation. Okay. Are there other questions about the appeal part? All right. So let me turn to the cross-appeal. So NXP raises two points of error. First, the board erred by misapplying the law of obviousness regarding same-size limitation. The court's decision in Valiant provides clear guidance. So in that case, the prior art disclosed a pH range of 3 to 7, and the claim required 3 to 4. So the district court found, well, that's not a limited, a finite set of options that might have been obvious to try. Mathematically, that's an infinite range. There are an infinite number of options in there. This court disagreed and said the mathematical approach is not how this should be considered. What we should consider is, in reality, a person with a reading skill in the art is going to select from a finite set of options within that. Maybe it's tens of options, maybe it's hundreds of options, but it's going to be a finite set of options rather than some mathematically infinite. And that makes sense because somebody is going to go dial in a particular size, and that's how they're going to test these out. Similar to the defendant in Valiant, NXP explained to the board that there are three options for size and cutouts. There's smaller, so undersized, there's same size, and there's oversized. And this was in Appendix 54, a site of the hearing and the briefing, and then this was clear in our petition at Appendix 348 and 6181. Okay, no parties suggest that undersized is something that Pasita would be interested in because you're not fully eliminating the parasitic capacitance, which is something that Chen was talking about. Okay, so let me skip over the same size for a second and talk about oversized. So in the record, oversized cutouts are primarily used by Chen to address some manufacturing alignment issues with a particular process that he was using. So he oversized the cutouts so that everything would align and then reintroduced some parasitic capacitance to do some fine-tuning afterward. Okay, so Chen also says in that process that by oversizing them, you might be introducing some impedance mismatch, kind of right there in that void where it's a little bit oversized. You might get a little additional impedance at that point. And so cautions against that, and again, that's part of why the cutouts there help tune that in. Okay, so this leaves... Okay, so then we look at that oversized cutout range. Again, it's not an infinite range like the board found. This court says we should look at that as a set of finite options within that range. And truly, you're limited if you look at Gray-Brief at 9. You can see that because these are repeating pads, you can only oversize so much because then you walk into the other pads. Okay, so this leads us to the most obvious third option, the same size. If you pick the same size option, then you completely reduce or completely eliminate the parasitic capacitance, and you don't introduce the problem that Chen was potentially concerned about with that mismatch. So much like in Valiant, the realistic size options are properly treated as limited options, and remand would be appropriate to allow the board to consider under the proper standard. Okay, the second point, the board erred by not allowing briefing under the construction of routing layer. So the board, in its final written decision, construed the term routing layer without any opportunity for the parties to address that construction. The board recognized that the term routing layer was not clear, but it was clear enough that it construed the term to mean a layer including at least one routing trace, or at least a routing trace is the specific language at appendix 45 and 115. Because this is not a harmless error, because the parties were not afforded an opportunity to brief under that adopted construction, the board discussed whether NXP had proved that they would swap the routing layer of Chen with the reference layer, like just replace them, swap them, and that's not required under that construction. All we need to show is one routing trace on that second layer. Counsel, you wanted to save a little time to respond on the cross-appeal, if it's dealt with. It's up to you. Thank you. Just one more point, or a couple more points, and then I'll reserve my time. Thank you. So in this case, the board also found, or yes, it found at appendix 41 and 43, that a procedure would likely have needed to add routing traces to that second layer. Who would? The PCETA would. Sorry, the board determined. The person of ordinary skill. Yes, I'm sorry. Speaking English rather than acronyms. I apologize. The person of ordinary skill would have likely needed to add routing traces. And this was the position we had taken in the petition, that it would have been likely necessary to add a route through that second layer, just with the number of signals going through. This would have meant that that first layer of Chen, as modified by what the person of ordinary skill would have needed to do, that layer would have become both a routing layer and a reference layer. And this is consistent with what the 340 patent figure 3 discloses, which is a mix of routing and reference planes. And, in fact, Bell's expert admitted that a layer could be a little bit of both. And so remand is appropriate to address these facts under the board's new construction. And I'll reserve the rest of my time. We'll save it for you. Mr. Silver. Thank you, Your Honor. The word integrated circuit does not appear anywhere in Chen. And we explained in our brief how those snippets of words, let's say substrate, let's say semiconductor implementation, they're taken out of context by the board. And so when you read the full paragraph surrounding them, what you will find is in every instance, and you didn't hear my friend on the other side say this, they're talking about the printed circuit board and when it interfaces with those components, or they're just talking about printed circuit boards in general. The one example that my colleague on their side gave was the statement, another example is a substrate used inside a BGA package in column one of Chen. Reading the sentences preceding that and following that, it's talking about the solder ball that's attached to those. And when that gets added to the printed circuit board, the impedance mismatch gets worse because the impedance changed between the microstrip on the surface and the pad gets larger. You get more metal in the way, changing the impedance. You're talking about the BGA? I'm talking about the statement on column one, I think it's around line 55 or 56, where it says another example is a substrate used inside a BGA package. BGA stands for ball grid array. It's referring to the solder balls that if you look at figure five of the Hall patents, are literally balls of solder that add metal, and that makes the impedance problem worse when you do that. And we've gone through those examples in our brief. Not only does the word integrated circuit appear nowhere in Chen, but the board's only reason to say microstrips were not required in Chen was based on a misapplication of clean construction law to reading the prior art. It's very clear in the case law that prior art is read for what it teaches, not what it claims. And just because claim one of Chen does not mention a microstrip or interconnecting conductor does not mean that every single embodiment relied on by my opponent was a printed circuit board with a microstrip and not an integrated circuit package substrate. Now on inherency, one thing you did not hear my colleague mention on the other side is that the parasitic capacitance was reduced between the layers. It's not. The only thing in Chen is parasitic capacitance reduced locally at the pad. The layer, as you heard in his cross appeal, is something broader that includes more components, and nobody did that analysis. And because there's no argument for inherency and nobody did the analysis, there's no basis to affirm on the parasitic capacitance reduction between the claimed layers. Now on the routing place on claims 16 and 17, you just heard an argument that claim 16 does not require a routing layer. That is not true. They use different terms. But they still require the underlying plane to be a signal layer which routes signals. And in Chen, it is a reference plane. It is a ground or power plane. It does not handle signals. And just because it doesn't use the same exact terminology does not mean these claims do not stand or fall together. Now turning briefly to the cross appeal, the board correctly held that Chen does not disclose same-size cutouts. Judge Rayner, you asked a question just earlier, does Chen require them to be oversized cutouts? The answer to that question is affirmatively yes. And not only is it my view, but it was my opponent's view in their brief at page 69 of their response brief. And this is because Chen identifies manufacturing limitations that prevented smaller-size cutouts. Moreover, there were large variances in fringe capacity that would not be controlled by reducing the size of the cutouts. So what do we have? We have art that doesn't teach it and says it's impossible. The board recognized that for this routing placement limitation, my NXP did not provide any motivation to change that reference. Sorry. Did not provide a motivation in its petition for same-size cutouts. And you can look no farther than appendix page 364 to see how anemic their petition's analysis of this claim was. Everything else you heard about smaller, medium, and large, and infinite options or not, that's from the reply brief. The board found that waived and they did not appeal that waiver decision. Now, turning to the obviousness to try, if you reach that issue at all, the Supreme Court requires finite, predictable solutions. There's been no showing of finite solutions. You have an infinite range of size, value, shapes, and locations. They have not specified what that set is, and the board correctly recognized that they would lose under that as well. As for the routing placement limitation, the claim construction they complain of came from their mouth. At oral argument, they were asked, is this your position? And my NXP confirmed, yes. It's in the transcript. It's also in their petition reply. Moreover, it's an express claim limitation in Claim 2. It says a routing layer including routing traces. It is not a claim construction, and nothing in this case turns on whether that claim is construed or written as it says to require routing traces. With that, Your Honor, I see I'm at the end of my time. Are there any questions on the Cross Appeal? Thank you, Your Honor. No, I think not, Mr. Silver. Thank you. We'll give you two minutes for about it on the Cross Appeal. Thank you, Your Honor. I just want to make a couple of points. Nowhere does Chin say anything is impossible. That is not something Chin says. Chin is talking about engineering a solution to a problem and is talking about the context of that problem. The motivation to combine was in our petition. It said Appendix 348 and 6181 for the other patent. Sorry, this is the motivation for the same size limitations. We specifically point out in our petition at 348 and at 6181, same size, less than, greater than. The routing layer, the issue there with the routing layer, so in the reply brief, we addressed the fact that there was confusion, there was uncertainty about the terms, and our BELLS expert was unable to determine whether a layer was a routing layer or a reference layer, and so that was the issue we were bringing up in our papers. But the board issued its claim construction for the first time then on appeal, and the issue there is the board then applied a different construction by requiring swapping the two layers as opposed to modifying the layer to add a routing trace. Thank you, Your Honors. Thank you to both counsel. The case is submitted.